# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MICHAEL J. GRELLE,<br>*Plaintiff* | §<br>§<br>§ | |
| -vs- | §<br>§ | SA-19-CV-00125-XR |
| CITY OF WINDCREST,<br>*Defendant* | §<br>§<br>§<br>§ | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

On this date, the Court considered Defendant's motion for summary judgment (ECF No. 26), Plaintiff's response (ECF No. 27), and Defendant's reply (ECF No. 28). After careful consideration, the Court issues the issues the following order.

## BACKGROUND[1]

This case arises out of Plaintiff Michael Grelle's termination from the Windcrest Police Department ("WPD") by Chief of Police Al Ballew on April 18, 2018. Plaintiff alleges that he was terminated on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII"), and on the basis of a perceived disability, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§12101 *et seq.* (the "ADA"). ECF No. 1. Defendant City of Windcrest (the "City") moves for summary judgment, arguing that the sole reason for Plaintiff's termination was his treatment of an arrested suspect during the last of three service calls made to the same residence on the evening of February 8, 2018. ECF No. 26.

---

[1] These facts are undisputed, unless otherwise noted.

## I. Service Calls (February 8, 2018)

At 10:04 p.m. on February 8, 2018, Plaintiff and Officer Adam Espinoza were dispatched to 8727 Tradewind Drive in Windcrest, Texas to respond to a service call from Megan Marie Johnston, who reported that she was being harassed by her former partner and the father of her child, Daniel Torrez. Acting as the primary officer, Officer Espinoza arrived first and observed Torrez standing at the front door of the residence. Officer Espinoza directed Torrez to leave the premises, and to arrange for another time to meet with Johnston. Torrez walked to his vehicle and drove away, and Office Espinoza cancelled the call before Grelle arrived at the scene.

Approximately thirty minutes later, Plaintiff and Officer Espinoza were dispatched to the same location to respond to a second call from Johnston indicating that Torrez had returned to the property. Plaintiff located Torrez in an alleyway behind the house, handcuffed him, and put him in the backseat of his patrol car.[2] Plaintiff then returned to the residence to speak with Johnston. She explained that Torrez had been "to the front and back of [her] house and peeping through windows" and that she believed he was intoxicated. ECF No. 26-3 at 50. She did not want to press charges, however. The officers approached Torrez in the patrol car and observed that he smelled of alcohol, but neither identified any signs of intoxication. After running a check on Torrez's license plate number and determining that he did not have any outstanding warrants, Plaintiff released Torrez from his handcuffs and ordered him to leave the location. Torrez left, walking in the opposite direction of his vehicle.

---

[2] The parties appear to dispute whether Plaintiff removed a knife from Torrez's pocket after he was handcuffed. In a subsequent investigation of the events, WPD concluded that, despite repeated statements from Torrez that he had a knife in his pocket, Plaintiff failed to remove the knife before placing Torrez in the patrol car. *See* ECF No. 26-3 at 50. In a separate declaration, however, Plaintiff insists that he took the knife from Torrez's pocket after conducting a pat-down, but returned it when he released Torrez and told him to leave the premises. *See* ECF No. 27-2 at 1–2. It is undisputed, however, the Torrez had the knife with him when he left the residence after the second service call.

2

An hour later, the two officers were dispatched to Johnston's residence for a third time. Torrez had returned to the house, entered through a second-floor window, and kicked open the door to Johnston's bedroom. During the altercation that ensued, Torrez pulled out his knife, and another person in the home, Sergio Pina, stabbed him in self-defense. Both suffered injuries. By the time the officers arrived, Torrez had fled the scene. The officers searched the area surrounding the house, and Plaintiff made requests over the radio for emergency services, for a DPS helicopter to help locate Torrez, and for assistance from the Bexar County Sheriff's Office in securing the perimeter. He led Mr. Pina to the back of his patrol car and read him his Miranda warning in anticipation of his interview with investigators. He then returned to the house to check on Johnston's five-year-old son, who was asleep upstairs.

Shortly after Plaintiff had returned outside, three other officers arrived at the scene: Lt. Daniel Hernandez, the Commander of the Investigations Division, Sgt. Kenneth Thuleen, the patrol operations supervisor, and Robert Chapa, the on-call detective. Dispatch reported that the suspect had been located at a nearby Valero gas station, and the officers at the scene left for Valero, where Torrez was arrested and treated by EMS for superficial wounds on his head and leg.

While at the Valero, Plaintiff approached Lt. Hernandez, Sgt. Kenneth Thuleen, and Det. Chapa and asked them if he could take Torrez to the police department. Lt. Hernandez asked Plaintiff if EMS had provided documentation indicating that Torrez's wounds were superficial and not life-threatening. Plaintiff stated that he had not received anything from EMS but would include that information in his report. He then suggested that the bandage on Torrez's head should be removed before taking him in for booking, so as not to alarm the magistrate's office and derail the intake process with concerns about his medical condition. Ultimately, Plaintiff did not need to remove the bandage, however, because Torrez removed it himself.

## II.     Fitness for Duty Evaluation (March 20, 2018)

On March 20, 2018, Chief Ballew submitted a request for an evaluation of Plaintiff's fitness for duty to a clinical psychologist, Kelly Shannon, Ph.D. ECF No. 27-5 at 1. In support of his request, Chief Ballew noted that, for the past year, Plaintiff had been "dealing with personal issues regarding his former girlfriend and the mother of their child." *Id.* These issues had escalated in recent months because his ex-girlfriend had become romantically involved with one of the WPD supervisors, Corporal Douglas Cianchetta. *Id.* Plaintiff's performance at work suffered as a result. Chief Ballew reported that Plaintiff exhibited mood swings and aggressive behavior, and was handling service calls in a haphazard manner. *Id.* Plaintiff had made troubling statements, such as "I am not able to control my emotions" and "I think I need medication," and had cried during a meeting with his supervisors. *Id.* Summarizing the "change in Officer Grelle's demeanor," Chief Ballew concluded, "I do believe he is experiencing various degrees of depression, animosity, anger and aggression and it is affecting his job." *Id.*

Dr. Shannon performed his evaluation that day and submitted his report to Chief Ballew the following day. *See id.* at 3–6. Dr. Shannon concluded that Plaintiff could continue to function on patrol, subject to two recommendations: (1) that Chief Ballew direct Plaintiff to seek mental health counseling and to provide the name of his chosen counselor, and (2) that Plaintiff avoid working under the direct supervision of Corporal Cianchetta to the extent possible. *Id.* at 5–6.

On March 27, 2018, Chief Ballew issued a memorandum to Plaintiff, notifying him of Dr. Shannon's conclusions and directing Plaintiff to seek mental health counseling. *Id.* at 9. Plaintiff was further required to provide the name of his counselor in writing, to notify Chief Ballew in writing when he stopped attending counseling, and, upon terminating counseling, to provide a written release from the counselor or submit to an additional evaluation by Dr. Shannon. *Id.*

### III.     Investigation and Termination (April 18, 2018)

On March 21, 2018—the same day Dr. Shannon submitted his report concluding that Plaintiff was fit for duty—Sgt. Thuleen sent a memorandum to Lt. Robert Reyes, Commander of Patrol, requesting disciplinary action based on Plaintiff's handling of the February 8, 2018 service calls, alleging various violations of WPD procedures. ECF No. 26-3 at 56–58. The next day, Lt. Reyes asked the Professional Standards Unit ("PSU") of the WPD to open an investigation. ECF No. 26-3 at 3–4.

On April 3, 2018, Chief Ballew initiated a separate investigation, this one based on a comment Plaintiff was alleged to have made in December 2017. ECF No. 26-3 at 32. Specifically, a fellow officer reported that, while she was sitting in the patrol room with several other officers, she heard Grelle state that he might not be able to control himself and would shoot Cpl. Cianchetta with his duty weapon. ECF No. 27-6 at 1–4. Plaintiff was notified about the investigations the following day and placed on administrative leave with pay. *See id.* at 1; ECF No. 26-3 at 44–45.

Lt. Hernandez was responsible for both investigations. After interviewing Grelle and the officers who had allegedly overheard his threatening comment and reviewing patrol room video footage, Lt. Hernandez determined that the evidence was inconclusive. ECF No. 27-6 at 4. Plaintiff returned to work on April 10, 2018. With respect to the February 8th service calls, however, Lt. Hernandez concluded that Plaintiff had violated multiple WPD policies and procedures and recommended that the matter be forwarded to the Action Review Board. ECF No. 26-3 at 54.

On April 17, 2018, Chief Ballew sent a memorandum to Windcrest's City Manager, Rafael Castillo, Jr., informing Castillo that he intended to terminate Plaintiff the following day. ECF No. 27-8. Chief Ballew explained that Grelle had "used very poor judgment and directly violated Windcrest Police Department Rules, Regulation, Policy and Procedure" during the calls on

February 8, 2018.[3] *Id.* at 1. He also cited Grelle's history of violating departmental policy, including two violations in the previous year for failing to properly search arrestees. Finally, he noted that Plaintiff had disregarded his direct written order to provide information in compliance with Dr. Shannon's recommendations following the fitness-for-duty evaluation.

Approximately one week after Plaintiff's termination, PSU opened an investigation into Officer Espinoza's conduct during the February 8, 2018 service calls. *See* ECF No. 27-7. Officer Espinoza was required to provide a written statement and submit to an interview with PSU investigators about the incident. The notice of investigation alleged several policy violations, noting that Officer Espinoza had failed to identify Torrez during the first call, had allowed him to leave the scene intoxicated during the second call, and had permitted the cover officer, Grelle, to handle the second and third calls. *Id.* There is no evidence that Officer Espinoza was ever subject to any disciplinary action in connection with the service calls.

Plaintiff filed this action on February 12, 2019, alleging claims of employment discrimination under Title VII and the ADA. ECF No. 1. Defendant now moves for summary judgment on both claims. ECF No. 26.

## DISCUSSION

**I.    Summary Judgment Standard**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must

---

[3] The details of these tactical and procedural errors may be relevant at trial insofar as they provide additional context for the termination and bear on the distinct responsibilities (and credibility) of the officers involved. However, Defendant repeatedly asserts in its summary judgment briefing that Plaintiff was terminated—while other officers who made similar errors that night were spared—*solely* because of his request to remove the bandages from Torrez's head. *See* ECF No. 26 at 7–9; ECF No. 28 at 3–5. Thus, for the purposes of this order, the Court need not address the minutiae of each of the alleged policy violations, which Grelle also disputes.

either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that

is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

**II.     Analysis**

    **A.     Title VII Claim**

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment because of race or color. 42 U.S.C. § 2000e–2(a)(1). Where a plaintiff lacks direct evidence of discrimination, the burden-shifting framework established by the Supreme Court in *McDonnell Douglas* governs. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). In order to survive summary judgment under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he is a member of a protected class, (2) he is qualified for the position at issue, (3) he suffered an adverse employment action, and (4) he was replaced by someone outside the protected class or was treated less favorably than others similarly-situated. *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. 792 and *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, (2000)).

If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its action. *Okoye*, 245 F.3d at 512. If the defendant satisfies its burden of production, the plaintiff may still prevail by offering sufficient evidence to create a genuine issue of material fact that either (1) the defendant's reason is false

8

and is a pretext for discrimination, or (2) that although the defendant's reason is true the plaintiff's protected characteristic was a "motivating factor" in its decision. *McDonnell Douglas*, 411 U.S. at 804–05; *Tratree v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 394 (5th Cir. 2008).

The Court concludes that Plaintiff has established a *prima facie* case of race discrimination under Title VII. It is undisputed that Plaintiff is a member of a protected racial class (white) and that he was qualified for his position as a WPD officer, and his termination from the WPD clearly constitutes an adverse employment action. Finally, Plaintiff has proffered evidence showing that he was treated less favorably than a similarly-situated officer outside of the protected class. Specifically, Plaintiff notes that although he and Officer Espinoza were both involved in the February 8, 2018 service calls and were charged with similar violations in their investigations, Plaintiff was terminated and Officer Espinoza, who is Hispanic, was not.

Because Plaintiff has met his initial burden, the burden of production shifts to Defendant to provide a "legitimate, nondiscriminatory reason" for the termination. In order to meet its burden, the City must provide both "clear and reasonably specific reasons" for its actions. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981). Here, the City asserts that "Plaintiff Grelle was terminated for untruthfulness and deception concerning his request to remove a bandage from an arrested suspect." ECF No. 26 at 7. Defendant observes that Plaintiff "was the only officer who requested to remove the bandage from the arrested suspect so that the Jail would accept the prisoner," and argues that this "untruthfulness and deception . . . led to Plaintiff Grelle's termination." *Id.* at 8. Thus, Defendant suggests that Officer Espinoza is not an appropriate comparator. *Id.*; *see Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) ("[A]n employee who proffers a fellow employee as a comparator [must] demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'").

9

Once the employer articulates a legitimate, non-discriminatory reason for terminating the employee, any presumption of discrimination established by the *prima facie* case disappears, and the employee bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against her because of her protected status. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011). To do so, the plaintiff "must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 217 (5th Cir. 2016).

Plaintiff offers several reasons to doubt that his request to remove Torrez's head bandages was the sole reason for his termination. First, Plaintiff accurately observes that the written notice of the allegations against him provided on April 4, 2018, does not even mention the removal of the bandages. ECF No. 27 at 3; *see* ECF No. 26-3 at 44–45. Likewise, an investigative document identifying questions that Grelle should address in his written statement contains no reference to the removal of the bandages. *See* ECF No. 26-3 at 49. Though other termination documents do mention Plaintiff's request to remove the bandages, none of the documents identify the request as the *sole* reason for the termination.

Indeed, the termination documents do not even consistently characterize the request as evidence of Plaintiff's "dishonesty." Lt. Hernandez's investigative report, for example, *does* conclude that Grelle violated General Manual Procedure ("GMP") 200.07A, which requires honesty and prohibits the use of "any improper or dishonest means to affect the outcome of any official test, process, or procedures." *See* ECF No. 26-3 at 53–54. Grelle's plan to remove the

10

bandages from Torrez's head to mislead the magistrate about his medical condition during the booking process would seem to fall squarely within the category of "dishonest" conduct prohibited by GMP 200.07A. But it is notably absent from the evidence Lt. Hernandez cites in support of this conclusion that Plaintiff had been dishonest. Instead, Lt. Hernandez relied on Grelle's apparently inaccurate statements during the third service call that the crime scene had been secured and that he had checked on the child who was asleep upstairs. *Id.* at 54.

It is possible that Lt. Hernandez did not emphasize Plaintiff's plan to remove the bandages in his investigative report because the supervising officers at the Valero—including Lt. Hernandez himself—acquiesced to Grelle's suggestion. Plaintiff submitted body camera footage of his conversation with Lt. Hernandez, Sgt. Kenneth Thuleen, and Det. Chapa, in which all three officers appear to approve of Plaintiff's suggestion that the head bandages should be removed so as not to alarm the magistrate. *See* ECF No. 27-1. Lt. Hernandez asserted in his investigative report that he had directed Grelle to leave the bandages on, ECF No. 26-3 at 52, and clarified in his deposition testimony that, for training purposes, this conversation took place after Grelle had turned off his body camera. ECF No. 27-2, Lt. Hernandez Dep. Tr. 31:13–19. Given that Lt. Hernandez interpreted the question as an opportunity for training, it is also possible that he did not cite it as evidence of dishonesty because he did not perceive it as dishonesty. Plaintiff maintains that he "was not trying to circumvent any process but was asking for clarification as to what could be done," and notes that "[i]n the end, Plaintiff did not remove the bandages." ECF No. 27 at 7–8.

The Court concludes that the City's inconsistent explanations for Plaintiff's termination are sufficient to create a genuine dispute of material fact as to whether he was actually terminated for suggesting the removal of Torrez's bandage. That is enough to meet his burden at the pretext stage of the analysis. *Reeves*, 530 U.S. 133, 143; *Vaughn*, 665 F.3d at 637. "If the trier of fact does

11

not believe the employer to have given a truthful account of its decision, it is reasonable to infer that the most likely explanation is the one the employer cannot admit—that it acted for retaliatory or discriminatory reasons." *Ameristar Airways, Inc. v. Admin. Review Board*., 650 F.3d 562, 569-70 (5th Cir. 2011). Thus, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Ameristar Airways, Inc. v. Admin. Review Bd.*, 650 F.3d 562, 570 (5th Cir. 2011); *see also Vaughn*, 665 F.3d at 637–38 ("Such rebuttal evidence, combined with the *prima facie* case, will suffice to create a genuine issue of material fact such that summary judgment is inappropriate.").

The City further asserts that it is entitled to a "same actor inference" because Chief Ballew, who is also white, hired and fired Plaintiff. ECF No. 26 at 7–8. "The same actor inference creates a presumption that animus was not present where the same actor responsible for the adverse employment action either hired or promoted the employee at issue" based on the theory that it is irrational for an employer to show animus in termination but not in hiring. *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 421-22 (5th Cir. 2009). The inference is strong when the same supervisory employee hires and fires a plaintiff within a short period of time, and even stronger when the supervisor and the employee are members of the same protected class. *Brown v. CSC Logic*, 82 F.3d 651, 658 (5th Cir. 1996). The Fifth Circuit has cautioned that this presumption is not irrebuttable, however. *See Haun v. Ideal Ind., Inc*., 81 F.3d 541, 546 (5th Cir. 1996) ("While evidence of such circumstances is relevant in determining whether discrimination occurred, we decline to establish a rule that no inference of discrimination could arise under such circumstances. Instead, we prefer to look at the evidence as a whole, keeping in mind the ultimate issue"); *Spears v. Patterson UTI Drilling Co.*, 337 F. App'x 416, 422 (5th Cir. 2009).

Plaintiff disputes that the City is entitled to the presumption, arguing that the City Manager, Rafael Castillo, Jr.—who is Hispanic—was ultimately responsible for Defendant's termination. ECF No. 27 at 8. Plaintiff also asserts that, even if the presumption applies, it should be afforded less weight here, given Plaintiff's five-year tenure with the WPD. *Id.* Plaintiff also correctly notes that the Supreme Court has clarified that the fact that the employer and employee are members of the same protected class should not be viewed as dispositive in discrimination cases. *Id.* (citing *Oncale v Sundower Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (members of a protected class may discriminate against other members of the same protected class)).

At this stage, however, the Court need not determine whether the City is entitled to the presumption. If it applies, the "same actor inference" is "relevant in determining whether discrimination occurred," *Haun*, 81 F.3d at 546, and merely "weighs against [Grelle's] evidence of discrimination." *Spears*, 337 F. App'x 416, 422. Because the Court has determined—based on his *prima facie* case of discrimination combined with evidence that the City's proffered reason was pretextual—that Plaintiff has raised a genuine issue of material fact as to whether his termination was motivated by racial discrimination, the Court can cannot conclude that Defendant is entitled to summary judgment on the basis of the "same actor inference" without improperly weighing the evidence now before the Court and improperly invading the province of the jury. Thus, whether or not the presumption applies, Defendant is not entitled to judgment as a matter of law on Plaintiff's Title VII claim for discrimination on the basis of race.

### B.     ADA Claim

The ADA prohibits discrimination against "a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of

employment." 42 U.S.C. § 12112(a). Under the 2008 ADA Amendments Act (the "ADAAA"), a person is considered disabled if he has been "regarded as having [an] impairment" where such an impairment resulted in the person being "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C.A. § 12102(1)(C); 42 U.S.C.A. § 12102(3).

In order to establish a *prima facie* case under the "regarded as disabled" prong of the ADA, Plaintiff must show that: (1) he was regarded as disabled (as described in 42 U.S.C. § 12102(3)); (2) he was qualified for the job; and (3) he was subject to an adverse employment decision on account of the perception of disability. *Cannon v. Jacobs Field Servs., N.A.*, 813 F.3d 586, 590 (5th Cir. 2016); 42 U.S.C. § 12102(1). If he makes that showing, a presumption of discrimination arises, and the employer must "articulate a legitimate non-discriminatory reason for the adverse employment action." *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009). The burden then shifts to the plaintiff to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual. *See id.*

Defendant's sole argument with respect to Plaintiff's ADA claim addresses the first element of Plaintiff's *prima facie* case: "there is no evidence that it considered Officer Grelle disabled." ECF No. 28 at 3. The Court disagrees. In his request for a psychological evaluation, Chief Ballew explicitly stated his belief that Plaintiff had been suffering from depression for several months and that it was interfering with his job performance. ECF No. 27-5 at 1. Though Dr. Shannon concluded that Plaintiff was fit for duty, Chief Ballew ordered Plaintiff to seek mental health counseling and report the name of his provider in writing and required Plaintiff to obtain a written release from the provider or submit to another interview with Dr. Kelley when he stopped

going to counseling. *Id.* at 9. This evidence is sufficient to establish that Chief Ballew regarded Plaintiff as suffering from depression, which generally qualifies as a disability within the meaning of the ADA. *Williams v. Tarrant Cnty. College Dist.*, 717 F. App'x 440, 447–48 (5th Cir. 2018) (noting that the ADA's implementing regulations promulgated by the EEOC identify major depressive disorder as among the list of impairments that should "easily be concluded" to substantially limit brain function); 29 C.F.R. § 1630.2(j)(3)(iii).

In his April 17, 2018 memorandum to Windcrest's City Manager explaining the termination decision, Chief Ballew referenced Grelle's failure to comply with the order to obtain mental health counseling. ECF No. 27-8 at 2 ("Grelle has and continues to disregard my direct written order to provide in writing to me, information relating the final report and compliance with recommendations submitted by Dr. Kelly Shannon."). A reasonable juror could conclude from the timing of the PSU investigations—initiated the day after Dr. Shannon concluded that Grelle was fit for duty and over six weeks after the events in question—that, having failed to remove Plaintiff from duty through a psychological evaluation, WPD opened the investigations in order to identify evidence that would justify the termination of an officer it perceived to have a disability. *See Ameristar Airways, Inc.*, 650 F.3d at 569 (concluding that, where an airline employee was terminated less than two weeks after he complained of safety violations to the FAA, it was "not unreasonable for a trier of fact to think this timeline gives rise to a natural inference of cause and effect").

Viewing the evidence in the light most favorable to the Plaintiff, the Court concludes that Chief Ballew's letter to the City Manager, the temporal proximity between the psychological evaluation and the PSU investigation, together with the evidence that Defendant's asserted reason for the termination was pretextual, described above, create a genuine issue of material of fact as to

whether Plaintiff was terminated "on account of" his perceived disability. *Cannon*, 813 F.3d at 590. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim of disability discrimination under the ADA must be denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 26) is **DENIED.**

It is so **ORDERED**.

**SIGNED** this 12th day of May, 2021.

 

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE